Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Attorneys for Plaintiffs Compass, Inc. and Compass California II, Inc.

(Additional counsel on signature page)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| COMPASS, INC.; and COMPASS CALIFORNIA II, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MLSLISTINGS INC.,<br><br>Defendant. | Case No. 5:26-cv-13652<br><br>**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1 AND RELATED CAUSES OF ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked across the Northern California counties in which Defendant MLSListings Inc. ("MLSListings") requires that listings be submitted to it, because of a rule set and enforced by MLSListings. MLSListings is governed by a Board of Directors dominated by direct competitors of Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass California II, Inc. (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of MLSListings. Under California law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass

homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as MLSListings requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. MLSListings, which has more than 15,000 subscribing brokers and agents and a mandatory-submission service area spanning twenty-two Northern California counties, is a combination of Compass' direct competitors, and its Board of Directors is dominated by Compass' direct competitors. Under MLSListings' rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, holds a single open house, provides the listing to an agent outside of their company, or publicly markets the home in any way MLSListings defines as "public marketing," the listing must be given to MLSListings and its co-conspirators within one business day, and the agent and homeowner must follow hundreds of MLSListings restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with MLSListings' rules.

5. Although California law states that real estate agents owe their clients a fiduciary duty of "utmost care, integrity, honesty, and loyalty," including a duty to follow their lawful instructions,[1] if a real estate agent follows the client's lawful instruction to publicly market a home outside of MLSListings, the agent then faces fines that start at $500 and escalate, cumulatively, up to $15,000, as well as suspension or expulsion from the very MLS they need to do business. More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[2] That is what MLSListings has done.

6. Compass brings this lawsuit to stop this illegal rule. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what MLSListings is doing: using control of a home listing database that real estate agents in MLSListings' service area cannot work without, MLSListings and its co-conspirators block

[1] Cal. Civ. Code § 2079.16; *Thomson v. Canyon*, 129 Cal. Rptr. 3d 525, 535 (Ct. App. 2011).

[2] FTC, *The Residential Real Estate Brokerage Industry* ("Butters Report") at 130 (Dec. 1983).

Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rule, MLSListings has continued to enforce it, re-approved it effective October 1, 2026, and, when Compass demanded that it stop, sued Compass. MLSListings' excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues MLSListings claims will result from pre- or off-MLS public marketing have not transpired. MLSListings itself did not impose its one-business-day public-marketing requirement until April 2020. But now, in a federal lawsuit it joined against Compass, MLSListings claims that its rule is needed to prevent "free riding" and to keep the market "transparent." MLSListings does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their clients' lawful public marketing instructions. Moreover, Compass does not "free ride" as MLSListings claims. Compass agents pay MLSListings substantial dues each year and contribute a significant proportion of its listings.

8. MLSListings and its co-conspirators have caused substantial economic harm to Compass and its agents, in addition to the immense harm MLSListings has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm MLSListings and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like MLSListings' foreclosed the option for Compass' agents to publicly market a home without giving it to the MLS, thus forcing them to follow MLS policies. Although the settlements were the result of MLS rules, MLSListings paid nothing. MLSListings forces Compass and its agents to give their valuable home listing data to MLSListings, which, upon information and belief, MLSListings then monetizes—charging vendors for access to its listing feeds, and having licensed that data to a third party for use in products sold to mortgage lenders—while paying Compass nothing. Because Compass is subject to MLSListings' rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue

(such as mortgage, title, and escrow). All of these harms, and any others caused by MLSListings' illegal rule, must be paid back threefold, and the illegal rule must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[3] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[4] As the FTC noted in its seminal report on U.S. residential real estate, the people who control the MLS "control . . . the most important aspects of brokerage practices."[5] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that fixed commission rates.[6] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[7] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[8]

---

[3] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[4] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

[5] Butters Report at 15.

[6] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

[7] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[8] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009) (final judgment).

11. MLSListings is one of the largest MLSs in Northern California, with a membership of over 15,000 competing brokers and agents and a mandatory-submission service area that covers twenty-two Northern California counties. MLSListings is governed by a Board of Directors dominated by those competitors.[9]

12. For decades, MLSListings has been an unavoidable and dominant feature of residential real estate brokerage. Participation in MLSListings is essential for any real estate agent to work in MLSListings' service area; real estate agents cannot effectively represent clients in those areas without being members of MLSListings subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing MLSListings' incredible market power, agents must follow MLSListings' rules or MLSListings will fine and punish them, potentially by exclusion from MLSListings. MLSListings polices its members through a Compliance department that investigates how its members (who are competitors) represent their clients. MLSListings encourages competing agents to report to MLSListings any rule violations by their competitors for punishment, and it assures them that "[a]ll reports remain anonymous."[10] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because MLSListings membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

---

[9] *Board of Directors*, MLSListings, https://www.mlslistings.com/about-us/board-of-directors; *Public License Lookup*, Cal. Dep't of Real Estate, https://www2.dre.ca.gov/PublicASP/pplinfo.asp.

[10] *How to Report a Clear Cooperation Violation*, MLSListings, https://support.mlslistings.com/s/article/How-to-Report-a-Clear-Cooperation-Violation; *see also MLS Rules and Regulations FAQ*, MLSListings, https://support.mlslistings.com/s/article/MLS-Rules-and-Regulations-FAQ (reporting party "can remain anonymous").

14. MLSListings Rule 7.5 specifically blocks competition among brokers and agents, and homeowner choice.[11] Rule 7.5 forces homeowners, brokers, and agents to give MLSListings their listings and forces them into all of the MLSListings restrictions: it requires broker participants to input every exclusive right-to-sell or seller-reserved listing of one-to-four-unit residential property or vacant residential lots in the service area within three days after the seller signs the listing agreement.[12] Rule 7.5 also dictates how a homeowner can publicly market their property. Unless they give the listing to MLSListings within one business day, homeowners and agents may not convey or display any information about the property or its availability for sale through any of the channels Rule 7.5 defines as public marketing—which include signs, public-facing websites, social media, brokerage and franchise websites, email and text campaigns, multi-brokerage listing-sharing networks, flyers, public applications, and open houses.[13] Even though MLSListings does not own the home or represent the homeowner, MLSListings is dictating how the homeowner and their agent must sell the home.

15. The effect of Rule 7.5 is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how MLSListings directs. Through this rule, MLSListings and its co-conspirators control how homeowners and agents market properties both on and off MLSListings. MLSListings and its co-conspirators, thus, control home marketing across the entire real estate industry in MLSListings' service area.

16. The rule stands directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property

---

[11] MLSListings Inc., *MLS Rules & Regulations* rr. 7.5, 7.6.1 (eff. Oct. 1, 2026), https://support.mlslistings.com/s/rules-compliance?tabset-b51c3=2 (follow "Rules & Regulations" hyperlink) ("*MLSListings Rules*").

[12] *MLSListings Rules* r. 7.5 ("Or, within 1 business day of marketing or advertising a property to the public on any exclusive right to sell or seller reserved listing agreement for the sale of the aforementioned properties, Broker Participants must input the listing to the Service for cooperation with other Participants.").

[13] *Id.*

via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the homeowner's sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control MLSListings) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

18. Rule 7.5 forecloses this strategy. Phase One listings cannot be publicly marketed at all unless the listing is first submitted to MLSListings. The "Members Only" and "Coming Soon" options MLSListings offers do not give homeowners the benefits of phased marketing, because a homeowner may use them only after filing the listing with MLSListings, where it is visible to every MLSListings subscriber. Under the "Members Only – Do Not Show" option, no one may show the property, and the homeowner may advertise it only as "Coming Soon."[14] The homeowner therefore cannot test the market through limited public exposure before deciding whether, when, and how to release the listing to every competing agent through the MLS.

---

[14] *MLSListings Rules* r. 7.2.3; *Members Only Overview*, MLSListings, https://support.mlslistings.com/s/article/Members-Only-Overview.

19. Rule 7.5 thus unreasonably restrains trade in two ways. MLSListings' agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and Rule 7.5 blocks competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC observed, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[15] Moreover, MLSListings is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why Rule 7.5 violates the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed in California for over 50 years.[16] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs MLSListings, expressly provides that an "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*,"[17] and preserves an alternative to the MLS, which it calls an "office exclusive."[18] Until April 2020, MLSListings' rules preserved that alternative. Rule 7.5 required only that a listing be input within three days after the seller signed the listing agreement, and Rule 7.6 (then titled "Exempted Listings") allowed a seller who refused to permit the MLS to disseminate the listing to exclude it by a signed certification without restricting how the excluded listing could be publicly marketed. In April 2020, MLSListings' Board of Directors adopted amendments that added the one-business-day public-marketing requirement to Rule 7.5.[19]

---

[15] Butters Report at 130.

[16] *See id.* (recognizing that an MLS "may . . . ameliorate[] any competitive injury" if alternative methods are available).

[17] *Id.* at 134 n.354 (emphasis added).

[18] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

[19] MLSListings Inc., *MLS Rules Changes Detail* r. 7.6 at 2 ("*April 2020 Rules Changes*") (added language shown in red); MLSListings Inc., *MLS Rules Change Log* 3 (Aug. 2024),

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like MLSListings Rule 7.5]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[20] Rule 7.5 violates the Fourteen Points antitrust policy and causes the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to Rule 7.5 that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[21] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[22]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of MLSListings' combination of competitors have forced upon the industry. But MLSListings blocks that choice and the competition that choice would bring.

23. MLSListings and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit

---

https://support.mlslistings.com/s/rules-compliance?tabset-b51c3=2 (follow "View Rules Change log" hyperlink) (April 2020 entries for Rules 7.5 and 7.6); *MLSListings Adopts Clear Cooperation Policy*, MLSListings, https://support.mlslistings.com/s/article/MLSListings-Adopts-Clear-Cooperation-Policy.

[20] Butters Report at 130.

[21] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[22] Butters Report at 130.

from the fiduciary duty agents owe to their clients of "utmost care, integrity, honesty, and loyalty."[23]

24. MLSListings has no valid justifications for its illegal conduct. Any claim MLSListings makes is undermined by recent history: until April 2020, MLSListings did not require listings to be submitted within one business day of public marketing, and MLSListings' rules did not restrict the public marketing of listings excluded from the MLS. During that period, MLSListings succeeded, and homes were legally sold throughout Northern California. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. MLSListings' restraints on competition are not about "transparency." MLSListings does not allow homesellers or homebuyers to become members or directly access the MLS database its members use.[24] MLSListings accepts only listings in which a broker participant represents the seller, so it does not accept for-sale-by-owner listings.[25] MLSListings' own rules allow listings to be hidden, just as long as they are not publicly marketed outside of MLSListings.[26] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[27] Compass also gets nothing for free. Its agents pay substantial annual dues and contribute a significant number of listings. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS).

25. Compass hereby brings claims against MLSListings for: (1) violating the Sherman Act, 15 U.S.C. § 1; and (2) violating the Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.*

---

[23] Cal. Civ. Code § 2079.16.

[24] *MLSListings Rules* rr. 4.1–4.2, 11.7, 12.12–12.13.

[25] *MLSListings Rules* r. 8.2 (only listings that create a representation agreement between the seller and a broker participant are eligible for submission).

[26] *See MLSListings Rules* r. 7.6.1 (office exclusive listings withheld from MLS dissemination); *id.* r. 7.2.3 (Members Only listings withheld from public display); *id.* r. 12.17 (listing broker may opt out of internet display).

[27] *Realcomp II, Ltd.*, 635 F.3d at 835.

**PARTIES**

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including California. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including California.

27. Plaintiff Compass California II, Inc. is a Delaware corporation that is licensed by the California Department of Real Estate as a corporate real estate broker and that operates as a real estate brokerage in California, including through branch offices in Los Gatos and San Jose, in Santa Clara County. Its main office is located at 891 Beach Street, San Francisco, California. Compass California II, Inc. is a wholly owned indirect subsidiary of Compass, Inc.

28. Compass California II, Inc. ("Compass California II") is a participant in MLSListings and is the entity against which MLSListings enforces its rules.

29. Defendant MLSListings is a California nonprofit mutual benefit corporation with its principal place of business at 740 Kifer Road, Sunnyvale, California 94086, in Santa Clara County. MLSListings was incorporated in January 2007 under the name Northern California Real Estate Exchange and adopted its current name in November 2007. It has voting members, and it has represented to a federal court that it has no parent corporation.[28] MLSListings has over 15,000

---

[28] Articles of Incorporation of Northern California Real Estate Exchange (Jan. 10, 2007) (on file with Cal. Sec'y of State, Entity No. 2941290) ("Articles of Incorporation"); Certificate of Amendment of Articles of Incorporation of Northern California Real Estate Exchange (Nov. 20, 2007) (on file with Cal. Sec'y of State, Entity No. 2941290); Rule 7.1 Statement, *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 29.

subscribers, and brokers and agents of six other Northern California MLSs have access to MLSListings listings through a regional data-share arrangement called the NorCal MLS Alliance. MLSListings' Board of Directors is dominated by licensed brokers who compete with each other and with Compass and its agents.[29]

30. MLSListings is a contract, combination, or conspiracy of competing agents and brokers. MLSListings' participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents have each agreed in writing to abide by MLSListings' rules;[30] they follow and enforce those rules; and MLSListings is governed by a Board dominated by competing brokers.

31. MLSListings Rule 7.7 provides that MLSListings serves the area coextensive with the territorial jurisdiction of its "shareholder" REALTOR® associations, and that, where MLSListings has entered into data-share or cross-pollination agreements with other MLSs, submission of covered listings is mandatory for the combined service areas set forth in those agreements. Rule 7.7.1 defines that mandatory-submission area to include twenty-two California counties: Alameda, Amador, Contra Costa, El Dorado, Marin, Mendocino, Merced, Monterey, Napa, Nevada, Placer, Sacramento, San Benito, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma, Stanislaus, and Yolo.[31] MLSListings' core service area consists of Monterey, San Benito, San Mateo, Santa Clara, and Santa Cruz Counties.

**MLSLISTINGS' CO-CONSPIRATORS**

32. Competing agents, including those enforcing MLSListings' rules and members of MLSListings' Board of Directors, conspired with each other and MLSListings to design, approve,

---

[29] Am. Compl. ¶ 36, *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28 ("MLS Am. Compl."); Statement of Information, CA Nonprofit Corporation, MLSListings Inc. (Apr. 14, 2026) (on file with Cal. Sec'y of State, File No. BA20260825300) (identifying Angela Savage as Secretary); *Board of Directors*.

[30] *MLSListings Rules* rr. 4.1.1(d), 4.2.1(c), 4.10.

[31] *MLSListings Rules* rr. 7.7–7.7.1; *Rule Change: MLSListings Expands Its Service Area*, MLSListings, https://support.mlslistings.com/s/article/Rule-Change-MLSListings-Expands-Its-Service-Area; *About MLSListings*, MLSListings, https://www.mlslistings.com/about-us/about-mlslistings.

enforce, and implement Rule 7.5. MLSListings' REALTOR® association owners include the Santa Clara County Association of REALTORS®, whose chief executive occupies the seat on MLSListings' Board of Directors reserved for a representative of MLSListings' association shareholders, and which participated in the combination.[32] On information and belief, MLSListings' other association members include the San Mateo County, San Benito County, Silicon Valley, Monterey County, and Santa Cruz County Associations of REALTORS®, which also participated in the combination. MLSListings has also coordinated with other MLSs to defend and maintain rules similar to Rule 7.5, including by joining six other MLSs in a single lawsuit against Compass seeking a declaration that those rules are lawful and an injunction barring Compass from challenging them.[33]

33. MLSListings' co-conspirators performed acts and made statements in furtherance of MLSListings' anticompetitive conduct. MLSListings is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

34. **Jurisdiction.** This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from MLSListings' and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

35. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction over Compass' state-law claim under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative fact as the federal claims.

---

[32] Santa Clara Cnty. Ass'n of REALTORS®, Form 990 (2024), sched. D, pt. VIII ("Investment in MLS Listing, Inc.," $5,193,420); *id.* pt. VII (Neil Collins, Executive Director/CEO); *Board of Directors* (seat for "a representative from our REALTOR® Association shareholders"); *see also MLSListings Rules* r. 7.7 (referring to MLSListings' "shareholder boards/associations of REALTORS®"); *id.* app. C, at 62; *Multiple Listing Services and Brokerages Opting into the National Association of Realtors Settlement*, Residential Real Estate Broker Commissions Antitrust Settlements, https://www.realestatecommissionlitigation.com/nar-opt-in (listing "MLSListings Inc" among opting-in REALTOR® MLSs).

[33] MLS Am. Compl. ¶¶ 1, 8, 14 & Prayer for Relief ¶ F.

36. This Court has personal jurisdiction over MLSListings because it is a California corporation whose headquarters and principal place of business are in Sunnyvale, California, in this District, and MLSListings conducts substantial business in this District.

37. **Venue.** Venue is appropriate in this District because MLSListings' headquarters and principal place of business are in this District and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this District. 28 U.S.C. § 1391(b)(1)–(2); 15 U.S.C. § 22. MLSListings was incorporated with the California Secretary of State in 2007 and lists its principal address, mailing address, and agent for service of process in Sunnyvale, California, in this District.

38. **Divisional Assignment.** This action arises in Santa Clara County, where MLSListings is headquartered and where a substantial part of the events or omissions giving rise to the claims occurred, including the adoption and enforcement of Rule 7.5. Under Civil Local Rule 3-2(c) and (e), civil actions that arise in Santa Clara County are assigned to the San Jose Division.

## TRADE AND COMMERCE

39. MLSListings has entered into agreements with each of its over 15,000 subscribers and facilitates the sale of thousands of residential homes and condominiums each year. MLSListings reports more than 31,000 total listings in 2025 alone and more than 1.2 million historical listings in its database.[34] These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

40. **Relevant Product Markets.** There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent

[34] MLS Am. Compl. ¶ 36.

Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

a. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control MLSListings compete in the Brokerage Services Market.

b. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control MLSListings compete in the Agent Services Market.

c. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data-sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or

worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. MLSListings participates in the MLS Market.

41. **Relevant Geographic Market.** The relevant geographic market for each of the defined product markets is no larger than the five counties that make up MLSListings' core service area—Monterey, San Benito, San Mateo, Santa Clara, and Santa Cruz Counties (the "MLSListings service area")—which MLSListings itself describes as the area in which it specializes.[35] A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms.

42. Brokers and agents cannot avoid MLSListings' rules by using a neighboring MLS or an MLS with a data-sharing agreement with MLSListings for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. MLSListings and the MLSs with which it shares data have rules based on the California Association of REALTORS® model. Under MLSListings Rule 6, MLSListings may enter into reciprocal or regional agreements with other MLSs, and its participants and subscribers agree to abide by the rules of those other MLSs and to follow those rules when accessing the other MLSs' databases.[36]

c. MLSListings Rule 7.7 provides that, where MLSListings has entered into data-share or cross-pollination agreements with other MLSs, submission of covered listings is mandatory for the combined service areas set forth in those agreements,

---

[35] *About MLSListings* ("We specialize in Monterey, San Benito, San Mateo, Santa Clara and Santa Cruz counties . . . .").

[36] *MLSListings Rules* r. 6.

and that submission to a cross-pollination partner MLS satisfies—but does not excuse—that requirement.[37] Since January 20, 2021, when MLSListings joined the NorCal MLS Alliance data share with BAREIS, Bay East, BridgeMLS, the Contra Costa Association of REALTORS®, MetroList, and the San Francisco Association of REALTORS®, MLSListings has taken the position that any listing taken anywhere in the twenty-two-county Alliance coverage area "is subject to the Clear Cooperation rules."[38] A broker therefore cannot escape Rule 7.5 by moving to a neighboring or partner MLS.

d. MLSListings' rules apply to all agents and listings affiliated with a "listing broker," which means that every listing by an agent affiliated with a brokerage is subject to Rule 7.5, even if the agent does not submit it to MLSListings and the homeowner does not want it in MLSListings. Rule 7.5 imposes the submission obligation on broker participants, and under Rule 4.6, whenever the rules refer to the listing broker, the term includes the "subscriber or licensee retained by the listing broker but shall not relieve the listing broker for responsibility for the act or rule specified."[39] Each participant must give MLSListings a list of every licensee affiliated with the participant's firm, and MLSListings assesses its recurring participation fees on those licensees unless the participant certifies in writing that a licensee does not use the MLS. And a participant may be disciplined for a violation by any salesperson affiliated with it; the participant's lack of knowledge of the violation goes only to mitigation.[40] Thus, if one agent in a brokerage needs

---

[37] *MLSListings Rules* r. 7.7 ("If the MLS has entered into agreements, data share agreements, cross-pollination agreements with other MLSs or a regional MLS corporation submission of the type of listings specified in section 7.5 is mandatory for the area covered by the combined service areas set forth in the agreements. Submission of the type of listings specified in section 7.5 input into another MLS is sufficient, if the MLS has entered into a cross-pollination agreement with MLSListings.").

[38] *Rule Change: MLSListings Expands Its Service Area*.

[39] *MLSListings Rules* rr. 7.5, 4.6.

[40] *Id.* rr. 4.4, 4.6, 5.1.2, 5.1.5, 14.2(c).

MLSListings access, then all agents in that brokerage are bound by MLSListings' rules.

43. To serve their clients and compete in the MLSListings service area, brokers and agents must have access to MLSListings and follow MLSListings' rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the MLSListings rules collectively have market power. In the MLS Market, MLSListings has market power.

44. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[41] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[42]

## FACTUAL ALLEGATIONS

**MLSs and the Antitrust Laws**

45. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. MLSListings is in the business of operating a broker cooperative by providing information and services to real estate brokers, agents, or appraisers for use in their professional activities. According to its Articles of Incorporation, MLSListings' purposes include:

---

[41] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

[42] DOJ & FTC, *Competition in the Real Estate Brokerage Industry* 12 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf ("*2007 DOJ/FTC Report*").

a. Developing, implementing, and operating a real estate information exchange platform that may be accessed by the persons to whom MLSListings grants access, which it calls "Participants."

b. Engaging in all necessary or appropriate activities to facilitate and promote the distribution of real estate information services to Participants.

c. Enabling Participants to make blanket unilateral offers of compensation to other Participants, and accumulating and disseminating information to enable Participants to prepare appraisals and other valuations of real property.

d. Functioning as a facility for the orderly correlation and dissemination of listing information among the Participants.

e. Entering into contracts regarding Participant enrollment, training, communications, and other services useful to the operation of MLSListings' real estate data exchange.[43]

46. MLSs also make and enforce rules. MLSListings explains how competing agents can help enforce its rules, and it provides a specific online form, telephone line, and email address to report violations of Rule 7.5, including by submitting photographs of yard signs and copies of flyers and emails.[44]

47. In addition to operating its members-only database, MLSListings distributes listing data to third parties,[45] such as real estate web portals, which monetize it in various ways. On information and belief, MLSListings also earns revenue from the listing data its participants are required to submit. MLSListings charges approved IDX vendors a recurring fee to provide MLSListings data to their customers.[46] And in January 2012, CoreLogic (now Cotality) announced that MLSListings

---

[43] Articles of Incorporation art. II.B; *see also MLSListings Rules* r. 2.

[44] *How to Report a Clear Cooperation Violation*; *see also MLSListings Rules* app. B, at 62 (reports of violations remain confidential).

[45] *MLSListings Rules* rr. 11.6, 12.13, 12.16.4; *About MLSListings* (describing the MLS as the source of "the listing feeds to sites like Zillow, Trulia, and Realtor.com").

[46] *IDX FAQ*, MLSListings, https://support.mlslistings.com/s/article/IDX-FAQ ("Approved IDX Vendors will be charged a quarterly fee to provide IDX/MLS data to our customers.").

had agreed to license its listing data to CoreLogic through Partner InfoNet, a "revenue sharing program" in which MLSs license listing data for use in risk-management products for mortgage lenders, loan servicers, and capital markets. As MLSListings' then-CEO explained, "[b]y licensing our data to an industry leader like CoreLogic, we can tap into the value of our listings."[47]

48. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are composed of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

49. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. They enforce those rules by fining and punishing their members.

50. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[48] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[49] That control has

---

[47] *CoreLogic Signs MLSListings to Partner InfoNet*, CoreLogic (Jan. 11, 2012), https://www.marketscreener.com/quote/stock/CORELOGIC-INC-6275906/news/CoreLogic-Inc-CoreLogic-Signs-MLSListings-to-Partner-InfoNet-13965500/; *CoreLogic Signs New Matrix, Partner InfoNet Deals*, Inman (Jan. 13, 2012), https://www.inman.com/2012/01/13/corelogic-signs-new-matrix-partner-infonet-deals/.

[48] *Realty Multi-List*, 629 F.2d at 1370.

[49] Butters Report at 92–93.

been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

51. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[50] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[51] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[52]

52. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies . . . have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[53] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[54]

53. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC described:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-

---

[50] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.

[51] *Realcomp II, Ltd.*, 635 F.3d at 819.

[52] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

[53] *2007 DOJ/FTC Report* at 63; *see generally Realty Multi-List*, 629 F.2d at 1354; *Realcomp II, Ltd.*, 635 F.3d at 819.

[54] *2007 DOJ/FTC Report* at 64 (describing and citing cases).

> competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[55]

54. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[56] Specifically, the antitrust policy expressly provided that "MLS shall not: *Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive*.'"[57] Point 10 provided that "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*."[58] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[59] The term "office exclusive" just meant the listing was not provided to the MLS. On information and belief, before MLSListings adopted its public-marketing requirement in April 2020, a homeowner could exclude a listing from MLSListings and market it however she wanted. Rule 7.5 cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid MLSListings' restrictions or market their homes how they choose under it.

**The Anticompetitive Rule**

55. MLSListings' rules are designed and approved by the brokers who sit on its Board of Directors. Under MLSListings Rules 1 and 3, the MLS is governed by the Board of Directors in accordance with MLSListings' bylaws, its rules are adopted by the Board, and all actions of its

---

[55] Butters Report at 109.
[56] *Id.* at 130.
[57] *Id.* at 134 n.354 (emphasis added).
[58] *Id.* (emphasis added).
[59] *Id.* at 130.

MLS Rules Committee are subject to the Board's approval. Under Rule 18, rule changes are recommended by the Rules Committee and approved by the Board, and changes mandated by NAR—such as NAR's Clear Cooperation Policy, which Rule 7.5 implements—are incorporated automatically, without a vote of the Rules Committee or the Board. The current version of MLSListings' rules, including Rule 7.5, was approved by the Board of Directors effective October 1, 2026.[60]

56. Rule 7.5 requires broker participants to input every exclusive right-to-sell or seller-reserved listing of one-to-four-unit residential property and vacant residential lots in the service area within three days after the seller signs the listing agreement—or, if earlier, within one business day after marketing or advertising the property to the public.[61] Rule 7.5 defines public marketing to include "conveying or displaying any information about the property or its availability for sale through or on any: windows, signs, public facing websites, social media, brokerage or franchise operated websites (including IDX and VOW), digital communications marketing (ex: email, text or phone blasts, social media messaging), multi-brokerage or franchise listing sharing networks, flyers or written material or on any applications available to the public or through conducting an open house."[62] The effect of this rule is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

57. If an MLSListings participant or subscriber violates MLSListings' rules, MLSListings can punish the real estate agent and/or brokerage by levying fines, blocking their access to the listings database, or suspending or expelling them.[63] Under MLSListings' schedule of citable infractions, advertising an exclusive listing that is not on the MLS is punishable by a fine of $500 for a first violation, $1,000 for a second, and $2,000 for a third, doubling thereafter to the "MLS maximum."[64] MLSListings tells its members that if a listing is not added within one business day

---

[60] MLSListings Rules rr. 1, 3, 18, TOC 1.
[61] *MLSListings Rules* r. 7.5.
[62] *Id.*
[63] *MLSListings Rules* rr. 14.2–14.4; *id.* r. 17.2.
[64] *Id.* app. A § 2.1, at 57.

after notice, the agent is fined $500, then $1,000, with the fine doubling each business day until it reaches $15,000, and that the amounts are cumulative.[65] MLSListings also reserves the right to bypass the citation process and charge a participant or subscriber through its hearing process, with the possibility of additional fines, suspension, or expulsion, and any participant or subscriber with more than three sanctions in a calendar year must attend a disciplinary hearing, which the responsible broker must also attend.[66] MLSListings polices its rules, as do MLSListings' members.

58. MLSListings has also extended its enforcement apparatus beyond its own members. Rule 12.16.1 requires IDX, VOW, and syndication recipients of MLSListings data that remove, restrict, or withhold a listing from public display to provide MLSListings, within one day of its request, the documents and information MLSListings needs to determine whether the listing or the participant complied with Rule 7.5, and it gives MLSListings' Board of Directors the final say on whether that documentation is sufficient.[67]

**See It First™ on Compass**

59. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

60. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on

---

[65] *MLSListings Adopts Clear Cooperation Policy*.

[66] *MLSListings Rules* app. B, at 62.

[67] *MLSListings Rule*s r. 12.16.1, app. A § 5.2.1, at 60.

Compass to clients where MLS rules permit it. MLSListings impedes that competition to protect its members, who are Compass' competition.

61. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[68] acknowledging that the listing will not initially appear in the active MLS feed.

62. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

63. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which, combined, have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

64. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

[68] These disclosures are available at https://www.compass-homeowners.com.

65. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into her advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in her listing, including days on market and history of price changes.

66. The phased marketing strategy has several advantages for homeowners.

a. First, because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

b. Second, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

c. Third, MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

d. Fourth, pre- and off-MLS marketing offers the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market.

> Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

67. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without disclosing dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals. At least nine agents in Northern California who recently joined Compass cited its inventory strategy and phased marketing as reasons for doing so.

68. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy sold for 4.6% more, had 34% fewer days on the MLS, and experienced 29% fewer price cuts. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

69. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to Rule 7.5 in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the

court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[69]

70. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

**Anticompetitive Effects**

71. Rule 7.5 restrains trade in several ways.

a. First, because MLSListings' participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of Rule 7.5 blocks competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC wrote, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[70]

b. Second, MLSListings is blocking competition by other public marketing methods, identified in MLSListings Rule 7.5 as including signs, public-facing websites, social media, digital communications marketing or through conducting an open house, and most significantly the Compass website itself.

c. Third, Rule 7.5 also reduces competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

---

[69] *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-5451, 2026 WL 2720641, at *22 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

[70] *Butters Report* at 130.

d. Fourth, Rule 7.5 further reduces competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

**MLSListings' Justifications Are Pretextual**

72. MLSListings has no valid justification for its illegal conduct. MLSListings operated without its one-business-day public-marketing requirement until April 2020,[71] and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. One of MLSListings' own data-share partners, BAREIS, neither imposes a one-business-day public-marketing requirement nor restricts the public marketing of listings that sellers have excluded from the MLS, yet MLSListings exchanges listings with BAREIS through the NorCal MLS Alliance.[72] Rule 7.5 is not required for operating a successful MLS. It is not a rule that ensures the integrity of the data distributed by MLSListings or prohibits its members from selectively editing or excluding the MLSListings listings they show their buyer clients. Rule 7.5 governs marketing itself and requires brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

73. MLSListings' restraints on competition are not about "transparency." MLSListings does not allow homeowners or homebuyers to become members or to directly access its database. MLSListings does not accept for-sale-by-owner listings. And MLSListings' own rules allow listings to be hidden, just as long as they are not publicly marketed.[73] Nor are MLSListings' restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

---

[71] *April 2020 Rules Changes* at 1–2; *MLS Rules Change Log* at 3.

[72] Bay Area Real Estate Info. Servs., Inc., *BAREIS MLS® Rules* rr. 8.2, 9.1–9.6, 9.7–9.8 ("Intentionally Left Blank") (rev. Feb. 1, 2026), https://bareis.com/my-bareis/mls-rules/rules-and-regulations.html.

[73] *See MLSListings Rules* rr. 7.6.1, 7.2.3, 12.17.

74. MLSListings' restraints also have nothing to do with "free-riding." In the federal lawsuit it joined against Compass, MLSListings alleges that brokers who publicly market listings while withholding them from the MLS are "free riding" on the contributions of other participants.[74] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, *every* member of MLSListings will be free to offer pre- and off-MLS marketing strategies to their clients.

75. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass agents provide value to MLSListings and its members in critical ways, including by paying dues, exposing their buyer clients to listings submitted by other members, and submitting listings to MLSListings for the benefit of all buyer agents in the MLSListings service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere.

76. In the federal lawsuit it joined, MLSListings asserts other arguments about the purported drawbacks of pre- and off-MLS marketing—for example, that it makes the market "less transparent" and threatens smaller brokerages[75]—that amount to little more than paternalistically telling homeowners and their agents what is best for them. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

77. MLSListings' purported alternatives do not cure the restraint. MLSListings' "office exclusive" option requires the seller to certify that the listing broker will do no public marketing or advertising of any kind—no yard sign, no website, no social media post, and no open house—and permits the listing to be promoted only within the listing brokerage.[76] MLSListings'

---

[74] MLS Am. Compl. ¶¶ 55–56, 80, 84.

[75] MLS Am. Compl. ¶¶ 1, 5.

[76] *MLSListings Rules* r. 7.6.1; *MLSListings Adopts Clear Cooperation Policy*. The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025).

"Members Only" option requires the homeowner to give the listing to MLSListings for display to every MLSListings subscriber before any public marketing begins, and under its "Do Not Show" version, the property may not be shown at all and may be advertised only as "Coming Soon."[77] And MLSListings' exemption for open listings requires the homeowner and the agent to give up the exclusive representation that most homeowners want and that standard California listing forms provide.[78]

**Antitrust Injury to Compass, Its Agents, and Homeowners**

78. MLSListings' conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

a. *Lost Commissions and Financial Harm to Brokerage*: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. *Degradation of Compass Website*: The enforcement of Rule 7.5 degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

c. *Depressed Sales Prices and Lost Sales*: By eliminating Compass' ability to pre-market and test pricing, MLSListings' rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

*MLSListings Rules* r. 7.6.1, which permits an office exclusive listing to be promoted only within the listing brokerage, is precisely the sort of "exception" that makes Rule 7.5 anticompetitive.

[77] *MLSListings Rules* r. 7.2.3; *Members Only Overview*.

[78] *MLSListings Rules* rr. 7.5, 7.6.1.

d. *Excessive Days on Market and Public Price Drops*: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

e. *Lost Agents*: Compass is unable to compete for agents by offering them a phased marketing strategy that they can offer their clients. Moreover, on information and belief, MLSListings currently supplies Compass agent listing and agent transaction data to third-party software vendors, which package those data into products that brokerages buy and use to target and recruit Compass agents. The data that MLSListings forces Compass and its agents to give to the MLS should not be sold to a technology company that, in turn, further sells that data with its agent recruitment technology. An MLS powering competitor recruitment tools strays far beyond the core mission of an MLS—it weaponizes Compass' operational data against Compass for competitor poaching.

f. *Loss of Convenience and Harm to Innovation*: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

79. Compass and its agents and homeowners have thus suffered antitrust injury as a result of Rule 7.5, which is imposed by MLSListings and the agents and brokerages who control it. Rule 7.5 is anticompetitive because it forecloses homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that Rule 7.5 forecloses, Rule 7.5 prevents Compass from offering phased marketing to homeowners and agents in the MLSListings service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one

and the same: Rule 7.5 prevents Compass from offering homeowners and agents innovative strategies they want.

80. Compass is therefore a proper party to bring this action. Compass' injury is direct. It flows immediately from MLSListings' rule and its enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

**MLSListings' Continuing Violations**

81. Because of Rule 7.5 and the sanctions MLSListings threatens for violating it, Compass California II cannot offer See It First™ on Compass to homeowners in the MLSListings service area as designed. Instead, it is forced to offer only the limited version that Rule 7.5 permits: an office exclusive that may not be publicly marketed at all, followed by MLSListings' "Members Only" status, which requires submitting the listing to MLSListings, where it is visible to every MLSListings subscriber. Neither option permits the limited public marketing before MLS submission that gives phased marketing its value. Homeowners in the MLSListings service area who would choose pre-MLS public marketing therefore cannot obtain it from Compass, and Compass loses the listings, commissions, ancillary revenue, and agent recruits that See It First™ on Compass would otherwise attract.

82. MLSListings has enforced Rule 7.5 against agents, and it threatens citations, fines that escalate up to $15,000 per listing, mandatory disciplinary hearings, and suspension and expulsion from the MLS for violations. For example, in 2026, MLSListings issued a "Clear Cooperation" warning to a Compass agent concerning a listing in Santa Cruz County, directing that the listing be added to the MLS by the end of the following day.

83. On September 8, 2026, Compass formally demanded that MLSListings stop fining or punishing real estate professionals for publicly marketing office exclusive listings, and asked MLSListings to confirm in writing by October 6, 2026, that it would do so. Compass followed up on September 18, 2026. On September 28, 2026, MLSListings' counsel requested an extension of the response deadline to October 28, 2026, and Compass agreed the next day. MLSListings did

not provide the requested confirmation by the extended deadline. Instead, on October 30, 2026—two days after that deadline—MLSListings joined six other MLSs as a plaintiff in a declaratory judgment action against Compass in the Southern District of New York, across the country from Silicon Valley, seeking a declaration that their rules are lawful under the Sherman Act and, as to MLSListings, the Cartwright Act, and an injunction barring Compass from suing them.[79] MLSListings joined that action in anticipation of this one, in an effort to deprive Compass of its choice of forum. MLSListings' rejection of Compass' demand confirms its and its co-conspirators' intent to continue enforcing Rule 7.5.

84. MLSListings' violations are continuing. Within the four years before this complaint was filed, MLSListings and its co-conspirators have committed new and independent acts that renew the restraint and inflict new and accumulating injury on Compass, including: (a) in 2026, issuing a Clear Cooperation warning to a Compass agent concerning a listing in Santa Cruz County; (b) approving, through its Board of Directors, the current version of its rules, effective October 1, 2026, which retained Rule 7.5; (c) adopting Rule 12.16.1, which enlists data recipients in enforcing Rule 7.5; and (d) refusing Compass' demand that it stop enforcing Rule 7.5. Each of the acts listed above required MLSListings to make a fresh, discretionary decision to maintain, tighten, or enforce Rule 7.5—a decision MLSListings was free not to make—and each inflicted new and accumulating injury on Compass. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because MLSListings continues to maintain and enforce Rule 7.5 today.

## CAUSES OF ACTION

### Count I
### PER SE ILLEGAL GROUP BOYCOTT IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

85. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

[79] MLS Am. Compl. ¶¶ 8, 64, 70, 86, 99–103 & Prayer for Relief ¶¶ A, C, F.

86. The agent members of MLSListings' Board of Directors are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

87. Through Rule 7.5, MLSListings forces Compass and its agents to forgo either (1) a critical input to their business (access to MLSListings in the MLSListings service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

88. The agreement by and among MLSListings and its governing members to implement and enforce this rule is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because MLSListings possesses market power in the MLS Market in the MLSListings service area; it controls access to an input—MLS participation—that agents need to compete effectively in the MLSListings service area; and Rule 7.5 lacks any plausible efficiency justification, because it governs agents' marketing to the public rather than the integrity or sharing of data within the MLS.

89. As a direct and proximate result of MLSListings' enforcement of Rule 7.5, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**Count II**
**COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)**

90. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

91. MLSListings is the dominant MLS in its core service area of Monterey, San Benito, San Mateo, Santa Clara, and Santa Cruz Counties. Membership in MLSListings and access to the MLS it operates are critical for agents working in the area. MLSListings is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. MLSListings and the agents and brokerages who control it are using their control of MLSListings to restrain competition in the Brokerage Services

Market and the Agent Services Market by implementing and enforcing Rule 7.5, which prevents Compass from offering See It First™ on Compass to its homeowner clients and agents and prevents any other agent from offering innovative pre- and off-MLS marketing strategies.

92. Rule 7.5's anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the seller-exclusion option MLSListings offered before April 2020, which did not restrict how excluded listings were publicly marketed, and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of Rule 7.5 is obvious enough to warrant an abbreviated, "quick look" analysis.

93. As a direct and proximate result of MLSListings' enforcement of Rule 7.5, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**Count III**

**COMBINATION IN RESTRAINT OF TRADE**
**IN VIOLATION OF THE CARTWRIGHT ACT**
**(CAL. BUS. & PROF. CODE § 16720 *et seq.*)**

94. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

95. MLSListings and each of the competing brokers on its Board of Directors are each a "person" within the meaning of California Business and Professions Code Section 16702. MLSListings' adoption, maintenance, and enforcement of Rule 7.5 is a combination of the capital, skill, or acts of two or more persons—MLSListings and its competing Board members have each agreed in writing to abide by and be bound by its rules—and therefore is a "trust" under Section 16720.

96. The purpose and effect of that combination is to create and carry out restrictions in trade or commerce, in violation of Section 16720(a), by preventing homeowners and their agents in California from publicly marketing listings except through MLSListings' distribution and by

preventing Compass from offering phased marketing in competition with MLSListings' agent-members. The combination is unlawful, against public policy, and void under Section 16726.

97. The combination is a group boycott that is unlawful *per se*. Alternatively, it is an unreasonable restraint of trade because its anticompetitive effects in the Relevant Markets alleged above substantially outweigh any pro-competitive benefit, which in any event could be achieved through substantially less restrictive means.

98. The combination was formed and carried out in California, is enforced against agents licensed in California, and restrains the marketing of residential real estate located in California.

99. As a direct and proximate result of the combination, Compass has been injured in its business and property, including through lost listing contracts, commissions, and revenue from ancillary services, and diminished value of its technology platform. Compass' injury flows from that which makes the combination unlawful: the suppression of competition in how, when, and to whom homes are marketed.

100. Under California Business and Professions Code Section 16750(a), Compass is entitled to injunctive relief, three times its damages, interest, and its reasonable attorneys' fees and costs of suit.

**REQUESTED RELIEF**

Compass requests the following:

A. A declaration that Rule 7.5 is an unlawful restraint of trade under 15 U.S.C. § 1 and California Business and Professions Code Sections 16720 and 16726;

B. An injunction prohibiting MLSListings from adopting, maintaining, or enforcing Rule 7.5, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An award of Plaintiffs' attorneys' fees and costs of suit; and

E. Such other relief that the Court deems just and equitable.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

By: /s/ *Joseph Tartakovsky*
Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

*Attorneys for Plaintiffs*
*Compass, Inc. and*
*Compass California II, Inc.*